UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

**DEFENDANT'S POSITION REGARDING SENTENCING**

Plaintiff,

Case No: 22-CR-120 (ECT/BRT)

v.

FAITH ROSE GRATZ,

Defendant.

This matter is scheduled for Sentencing before the Honorable Judge Eric C. Tostrud on November 15, 2024, at 10:00 a.m. Defendant now submits this memorandum in support of her sentencing request.

## I.    Ms. Gratz's Background

Ms. Gratz was born to two loving parents a few days before Christmas on December 21, 1997. Her upbringing was marked by a close-knit family and encompassed a supportive environment free from alcohol or drug abuse. Ms. Gratz tried alcohol for the first time at 21 years old, but never took a liking to it. She is unable to recall now the last time she drank, and she has never tried any drugs, including marijuana. Overall, Ms. Gratz grew up in a safe, sheltered, and supportive home.

Her father works as a correctional officer, a career path also chosen by her two siblings (Skylar, age 24, and Hunter, age 22). After graduating high school in 2016, Ms. Gratz attended college at the University of Northwestern in St. Paul, Minnesota. Despite struggling academically, she persisted for two semesters before she withdrew. She then attended North

1

Hennepin Community College briefly before deciding to follow in her family's footsteps. Ms. Gratz thus became a correctional officer in 2020.

That same year, when Ms. Gratz was 23 years old, she met the late Mr. Adam James, nearly 20 years her senior, who had a daughter from a previous relationship. Despite the age difference, Ms. Gratz and Mr. James married in 2021, starting a short-lived, yet tumultuous relationship. Unfortunately, this relationship was marked by Mr. James' history of alcohol abuse and emotional abuse towards Ms. Gratz. She also suspected Mr. James of being unfaithful during their marriage. This mistreatment, abuse, and neglect Ms. Gratz endured from her husband quickly eroded her self-confidence, making her even more vulnerable and susceptible to manipulation.

From a young age, Ms. Gratz battled anxiety, depression, and a low sense of self-worth. Her mother says that Ms. Gratz always needed significant coaching and guidance in her life, as highlighted in the letter of support from her mother (Attachment 1). Ms. Gratz's emotional challenges and low self-esteem, coupled with her need for guidance, made her extremely vulnerable to manipulation. These factors, exacerbated by the abusive relationship with her husband, ultimately influenced the regrettable decisions that comprise this case.

## II.    Mr. Gratz's Offense Conduct

Ms. Gratz's involvement in this case is best detailed in the Acceptance of Responsibility Letter she wrote (Attachment 2). Amid personal turmoil in her home life, Ms. Gratz found solace in the care and attention of Inmate Axel Kramer at the prison where she worked. Initially innocuous, their interactions escalated into romance as Inmate Kramer provided the emotional support that Ms. Gratz was craving. Inmate Kramer began by asking Ms. Gratz personal questions that progressively grew in their personal nature. He told Ms. Gratz that he wanted to talk to her more and seemingly expressed strong interests and feelings toward her. Ms. Gratz, as

vulnerable as she was, quickly grew feelings for Inmate Kramer, who was expressing all the right feelings she felt she lacked. Their relationship evolved into a "romantic" entanglement, and Inmate Kramer began pushing the bounds of this "relationship," he even admitted to kissing Ms. Gratz inside the prison.

Inmate Kramer's requests began innocently with personal questions, which quickly grabbed Mr. Gratz's attention and filled her heart with hope. Eventually, Inmate Kramer expressed his desire to talk to Ms. Gratz more and requested she bring him a cell phone. Ms. Gratz, who was reluctant and concerned, did not feel comfortable complying with this request. When Ms. Gratz expressed concern to Inmate Kramer, he reassured her this request was harmless and spoke about a happy future together. After much persuasion and begging, Ms. Gratz was swooned by his charm and persistence, and she was finally won over. Ms. Gratz brought Inmate Kramer the requested cell phone, through which they communicated clandestinely. Inmate Kramer even saved Ms. Gratz's phone number in his phone under the contact's name "bbygirl." As a result, Ms. Gratz was seeking validation and succumbed to his manipulation, which was disguised as genuine care and attention.

Ultimately, their "relationship" furthered, culminating in Inmate Kramer persuading Ms. Gratz to smuggle contraband into the prison. After compliance with Inmate Kramer's request for a cell phone, he further abused this relationship by consistently requesting Ms. Gratz meet with someone to pick something up for him. Ms. Gratz was hesitant and concerned about such an arrangement and expressed this to Inmate Kramer. However, knowing he previously manipulated Ms. Gratz into completing requests for him, he would calm her nerves by telling her not to worry and that he would never put her in harm's way. He assured Ms. Gratz that if she completed this one-time task, they would be able to secure much-needed money for their future together. Ms.

Gratz again fell victim to his manipulation. Ms. Gratz was sent $5,000 through an app on her phone, and Inmate Kramer ended up compelling her to pick up more packages for him.

Since Ms. Gratz had never taken drugs before, she was unable to tell exactly what was in the packages. After the third or fourth request, Ms. Gratz suspected the packages contained drugs because of how the packages felt, despite not actually seeing the contents. Regardless, she smuggled packages into the prison, fully aware of the illegality and ethical violation of her actions. She knew from the beginning that it had to be some form of contraband, and even if it was not, she was still abusing her position of authority for a scheming inmate.

Law enforcement intervened on April 5, 2022, seizing the cell phone from Inmate Kramer and confirming that Ms. Gratz provided him the cell phone, and that she was engaged in an inappropriate relationship with him. On April 7, 2022, law enforcement obtained a search warrant for Ms. Gratz and her vehicle. The next day, officers waited for Ms. Gratz outside the prison in anticipation of her arrival for her scheduled work shift. Ms. Gratz was then detained. She admitted to having a package in her car, smuggling two cellphones with chargers into the prison, and smuggling packages into the prison on six prior occasions during the previous four months. Subsequent investigation confirmed contraband smuggling, implicating Ms. Gratz in serious criminal conduct.

On September 7, 2022, Ms. Gratz pled guilty to Conspiracy to Distribute 50 grams or More of Actual Methamphetamine from January 1, 2022, through April 8, 2022, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A).

Ms. Gratz's explanation as it pertains to this case is a regrettable story about a vulnerable young woman whose immaturity and emotions led her to be manipulated by an inmate with the allure of love and a bright future together, away from the abuse and turmoil she was

experiencing at home. These tempting strums on her heartstrings convinced Ms. Gratz to smuggle contraband into prison. Ms. Gratz's gullibility is in no way an excuse for her actions, as she readily recognizes. Ms. Gratz agrees that a prison sentence is a necessary consequence of her actions. However, for the reasons that follow, it is the Defense's position that a sentence of 24 months imprisonment is the appropriate punishment.

### III.    Offense Level Computation

The Defense agrees with the offense level computation as detailed in the Presentence Investigation Report, except for one necessary addition following amendments to the United States Sentencing Guidelines effective November 1, 2023.

The Presentence Investigation Report was prepared on November 14, 2022, and filed with the Court on the same day. Under Federal Rule of Criminal Procedure 32(f)(1), objections to the report must be filed within 14 days of receipt. However, the Court may "allow a party to make a new objection at any time before sentence is imposed" for good cause. Fed. R. Crim. P. 32(i)(1)(D). Ms. Gratz respectfully requests that the Court apply the amendments to the Guidelines that were effective on November 1, 2023.

Effective November 1, 2023, the United States Sentencing Guidelines were amended to incorporate § 4C1.1, allowing for a reduction in offense level for certain zero-point offenders. *See* U.S.S.G. § 4C1.1. Ms. Gratz satisfies all criteria outlined in U.S.S.G. § 4C1.1(a)(1)-(10), warranting a **2-level reduction** of her offense level. U.S.S.G. § 4C1.1(10).

Considering the retroactive application of U.S.S.G. § 4C1.1, which came into effect nearly one year after the filing of the Presentence Investigation Report, and Ms. Gratz's alignment with all stipulated criteria, there exists sufficient cause for the Court to approve the additional **2-level reduction** in Ms. Gratz's offense level calculation. *See* § 1B1.10(e)(2).

5

Initially, the Presentence Investigation Report assigned Ms. Gratz a total offense level of 31 and Criminal History Category I, resulting in an anticipated guideline range of 108 to 135 months' imprisonment. With an additional **2-level reduction** under U.S.S.G. § 4C1.1, it is the Ms. Gratz's position that the Court should assign a total offense level of 29 and Criminal History Category I, yielding a guideline range of 87 to 108 months' imprisonment.

### IV.    Ms. Gratz Requests a Variance from the Sentencing Guidelines Based on the 18 U.S.C. § 3553(a) Sentencing Factors

Ms. Gratz respectfully requests the Court to consider a sentence of 24 months in prison. A district court is afforded "wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. DeMarrias*, 895 F.3d 570, 574 (8th Cir. 2018) (citation omitted). The Court must consider each of the factors outlined in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See e.g.*, *Gall v. United States*, 552 U.S. 38, 59 (2007).

After calculating the appropriate guideline range and assessing the potential for departures, courts are mandated to evaluate the factors in § 3553(a) to determine whether to impose a guideline or non-guideline sentence. *See United States v. Solis-Bermudez*, 501 F.3d 882, 886 (8th Cir. 2007). However, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than adhering solely to the Sentencing Guidelines, the sentencing court must conduct an individualized assessment based on all § 3553(a) factors. These include the offender's history and characteristics; the nature and circumstances of the offense; sentences for similarly situated defendants; the need to reflect the seriousness of the offense, promote respect

for the law, provide just punishment, deterrence, and protection of the public; and rehabilitation

of the offender. 18 U.S.C. § 3553(a).

Factors already considered in guideline calculations and those historically excluded as

bases for departures, now are part of the analysis and form the basis for variance considerations.

*United States v. Stoner*, 795 F.3d 883, 885 (8th Cir. 2015); *see also United States v. Feemster*,

572 F.3d 455, 463 (8th Cir. 2009) (defendant's young age at the time of the offenses, the lack of

possessing a weapon, and success on probation, as substantiation for the court's decision).

The philosophy underlying sentencing is that courts should consider the individual as a

"whole," and not just the act that was done. *Pepper v. United States*, 562 U.S. 476, 487-88

(2011). In *Pepper*, the Supreme Court articulated this long-held belief in the purpose of

sentencing:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime. Consistent with this principle, we have observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. In particular, we have emphasized that highly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant.

*Id.* (citations and internal quotation marks omitted). Thus, many factors related either to the case

or to an individual's personal history play into the rationale behind the sentence imposed.

A sentence of 24 months in prison, followed by a period of community supervision,

aligns with the principles of justice and is the most appropriate sentence for Ms. Gratz, based on

the following factors:

A.      **The Nature and Circumstances of the Offense and the History and Characteristics of Ms. Gratz**

The nature and circumstances of this offense, along with Ms. Gratz's personal history and characteristics, are thoroughly detailed above. These factors substantiate a sentence of 24 months in prison as both fair and appropriate.

B.      **The Need for the Sentence Imposed**

18 U.S.C. § 3553(a)(2) provides the following factors that the Court must consider when determining the appropriate sentence to impose.

i.      **To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

Sentencing Ms. Gratz to 24 months in prison will appropriately reflect the seriousness of the offense, promote respect for the law, and ensure just punishment, considering all relevant factors in her case.

Smuggling drugs into a prison, especially while holding a position of trust as a correctional officer, is a serious offense, and Ms. Gratz acknowledges the severity of her actions without seeking to diminish their significance. However, there is a difference between Ms. Gratz and others in her position that the sentencing guidelines do not consider.

If a correctional officer was nefariously smuggling contraband into a prison for the purpose of their own financial gain, or by a scheme of their own making, a sentence of 87 to 108 months as recommended by the guidelines may be justified. Here, Ms. Gratz's emotional vulnerability led her to be persuaded by an inmate, who wooed her with promises of a bright and happy future together, into doing his bidding for the purpose of securing their happily-ever-after. Gullibility is no excuse, but the unique and sad facts of this case certainly warrant a sentence that varies from the guideline prison sentence. Sentencing Ms. Gratz to spend 24 months locked away in prison will adequately reflect the seriousness of her regrettable conduct.

Punishing Ms. Gratz for this offense by imprisoning her for 24 months will promote respect for the law. The young Ms. Gratz will spend years of her life stripped of her freedom, and likely tormented by fellow inmates for her foolishness and stupidity. She may be mocked and ridiculed and forced to lament her decisions that were entirely out of character for her while locked in a cold and uncomfortable prison cell. For anyone lacking regard for the law as it pertains to Ms. Gratz and this offense, a sentence of 24 months in prison will show them that an offense like this is not tolerated. Sentencing Ms. Gratz to any more months in prison will not promote respect for the law any further than a sentence of 24 months in prison will.

### ii.    To afford adequate deterrence of criminal conduct

Aside from the offense in this case, Ms. Gratz has a good, clean record with no prior criminal charges and has never even received so much as a speeding ticket. The unique circumstances surrounding this case created a perfect storm for this vulnerable 24-year-old young woman to become involved in a serious crime that was wholly uncharacteristic and is deeply regrettable given the significant prison time she must now face.

Any period of incarceration will have a profound impact on Ms. Gratz, who has taken full responsibility for her actions and is committed to avoiding any behavior that could lead to future criminal conduct. The consequences of her actions have also been deeply felt by her friends and family, especially her father and two brothers, who are correctional officers. These unfortunate circumstances add to the gravity of her situation and serve as a powerful deterrent against any future wrongdoing.

Moreover, Ms. Gratz has been free from custody since July 29, 2022, without any pretrial release violations. Throughout this time, she has diligently adhered to all conditions of her pretrial supervision, demonstrating her commitment to compliance and rehabilitation.

Given these unique circumstances, deterring others from engaging in similar conduct to Ms. Gratz would not be enhanced by imposing a sentence of 24 months in prison. The singular nature of Ms. Gratz's situation and her proactive steps toward rehabilitation underscore the appropriateness of a sentence that takes into account her remorse, lack of prior criminal history, and commitment to lawful behavior moving forward.

### iii.        To protect the public from further crimes from Ms. Gratz

This is a Title 21 offense with no identifiable victim. Aside from this offense, Ms. Gratz has no prior criminal charges. She was released from custody on July 29, 2022, on a personal recognizance bond with pretrial supervision and release conditions. Since her release, Ms. Gratz has been working two jobs and bettering herself through self-improvement, and has fully complied with her conditions of release.

Regardless of the length of imprisonment the Court deems appropriate for this offense, it is important to note that Ms. Gratz poses no ongoing danger to the public. Her clean record, coupled with her proactive efforts toward rehabilitation and the absence of any prior criminal behavior, underscores her commitment to compliance and lawful conduct.

### iv.        To provide Ms. Gratz with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Ms. Gratz has a history of anxiety, depression, and low self-worth, conditions that have been exacerbated by the regrettable mistakes she made in this case, and the recent, unexpected death of her husband. Since September 2022, she has been attending weekly counseling sessions to address and heal her mental health, as evidenced by the letter written by her counselor. (Attachment 3). Continued therapy will be a great benefit for Ms. Gratz, especially considering the emotional strain she will face in prison, surrounded by peers who may treat her harshly.

Following the offense in this case and the loss of her husband, Ms. Gratz moved back in with her parents and prioritized fostering positive relationships with her family (Attachment 4). As noted in the Presentence Investigation Report, she has limited financial resources and has been working two jobs. However, a lengthy prison sentence will inevitably disrupt her ability to continue working. At 24 years old, Ms. Gratz has gone from having a clean record, never receiving so much as a speeding ticket, to being a convicted felon. Regardless of the length of her sentence, she will encounter significant challenges reintegrating into society upon release.

Despite these difficulties, Ms. Gratz maintains aspirations for her future. In her Acceptance of Responsibility Letter, she expresses her desire to pursue studies in Mortuary Science. She says, "I feel that I can still do what I was called to do which is to help people through hard times when they lose someone close to them like a family member or a spouse, because I have lost people close to me[,] so I really want to do this." Ms. Gratz is driven by her belief that she can provide comfort to grieving families based on her own experiences with loss. Vocational programming would greatly benefit Ms. Gratz in achieving these goals.

A sentence of 24 months in prison aligns with the goals of sentencing while enabling Ms. Gratz to rebuild her life sooner. It would afford her the opportunity to pursue her vocational ambitions, reunite with her supportive family, and contribute positively to the community at an earlier opportunity.

This approach not only considers the gravity of Ms. Gratz's offense but also recognizes her potential for rehabilitation and future contribution to society, emphasizing the importance of a balanced and sympathetic sentencing decision.

**C.    The Kinds of Sentences and the Sentencing Range Established for Ms. Gratz**

The initial Presentence Investigation Report assigns Ms. Gratz a total offense level of 31 and Criminal History Category I, with the anticipated sentencing range being 108 to 135 months imprisonment. As explained above, we are asking the Court to apply an additional **2-level reduction** pursuant to the U.S.S.G. § 4C1.1(10) amendment. With a **2-level reduction**, the total offense level is 29 with an anticipated sentencing range of 87 to 108 months' imprisonment. The mitigating factors detailed throughout this memorandum reasonably warrant a sentence of 24 months imprisonment.

Moreover, the safety valve provision under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 allows certain non-violent drug offenders to receive sentences below the statutory mandatory minimum if they meet specific criteria. The defendant has the burden to affirmatively prove each requirement under the safety valve provision. *United States v. Garcia*, 675 F.3d 1091, 1094 (8th Cir. 2012). Below are the safety valve criteria a defendant must satisfy:

> The safety valve requires that: (1) the defendant does not have more than four criminal history points, a prior three point offense, and a prior two point offense; (2) the defendant did not use violence or a credible threat thereof or possess a dangerous weapon in the commission of the crime; (3) the offense did not result in anyone's death or serious injury; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense; and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the government all information and evidence the defendant has concerning the offense.

18 U.S.C. § 3553(f)(1)-(5); U.S.S.G. § 5C1.2(a).

Here, Ms. Gratz meets all the criteria set forth above. First, she has no criminal history and thus does not have more than one criminal history point. Second, this offense did not involve the use of violence or possession of a dangerous weapon. Third, there was no resulting death or serious injury following Ms. Gratz's actions. Fourth, Ms. Gratz was not the organizer, leader, manager, or supervisor of others in the offense. Lastly, Ms. Gratz has fully and truthfully

provided all information and evidence concerning the offense, and she has also taken full responsibility for her regrettable actions.

Therefore, Ms. Gratz meets all the specified criteria under U.S.S.G. § 4C1.1(10), warranting a total offense level of 29 with the **2-level reduction**. She also satisfies the U.S.S.G. § 5C1.2 criteria, allowing this Court to impose a sentence below the statutory minimum. Given the wide latitude afforded to this Court in weighing the factors of this case and considering the unique circumstances, we respectfully request that Ms. Gratz be sentenced to 24 months in prison.

**D.     Any Pertinent Policy Statement**

The Defense is not aware of any current policy statements issued by the Sentencing Commission that would impact Ms. Gratz's sentencing.

**E.     The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct to Ms. Gratz**

This Court is urged to avoid unwarranted sentence disparities among defendants with similar records to that of Ms. Gratz. Below is an examination of how courts have displayed their wide latitude and discretion when sentencing correctional officers who smuggle contraband into prisons.

In *Akers*, a correctional officer was involved in a drug smuggling scheme with at least two inmates with whom she had sexual relations with and was sentenced to 46 months in prison. *United States v. Akers*, 476 F.3d 602, 603-04 (8th Cir. 2007). The defendant was charged in a nine-count indictment, including four counts of introducing controlled substances into a federal facility, four counts of accepting bribes, and one count of making a false statement to investigators. *Id.* at 604.

In *Cox*, a correctional officer was caught smuggling various contraband into a prison for an inmate in exchange for money on seven occasions over a span of nine months. *United States v. Cox*, 449 F. App'x 547, 548 (8th Cir. 2012) (unpublished and enclosed) (Attachment 5). The defendant was sentenced to 12 months and 1 day in prison. *Id*. In affirming, the court sympathized with the defendant's history of service in the United States Army, his personal characteristics, and his good record. *Id*. at 548-49.

In the present case, Ms. Gratz is similar to the defendant in *Akers* because she was a correctional officer who smuggled contraband into a prison. At a glance, it may be reasonable for this Court to infer the conduct in *Akers* was more serious than Ms. Gratz's because of the nine-count indictment; even so, the court upheld the sentence of 46 months. *See Akers*, 476 F.3d at 604. In regard to Ms. Gratz's inappropriate relationship with Inmate Kramer, it is clear that kissing is significantly less serious than sexual interactions – let alone with more than one inmate, as was seen in *Akers*. Inmate Kramer preyed on Ms. Gratz's vulnerability and exploited her desires for a better future together, influencing her to smuggle contraband into prison for him. Ms. Gratz's emotional fragility ultimately led her to be manipulated by an inmate who seemingly cared for her. Ms. Gratz has taken full responsibility and does not attempt to make light of her actions, but in no way did her conduct amount to more than a kiss and inappropriate communication. Although both the defendant in *Akers* and Ms. Gratz abused their position of trust as correctional officers, Ms. Gratz's conduct was less serious than that found in *Akers*.

Moreover, Ms. Gratz is like the defendant in *Cox* because she was caught smuggling contraband into prison for an inmate on six occasions over a span of four months. Just as the court offered leniency to the defendant in *Cox* based on personal standing, we ask this Court to offer Ms. Gratz similar leniency when determining her sentence. Mr. Gratz should be afforded

leniency because of her clean record, personal characteristics, family history, and all other factors highlighted throughout this memorandum. It has been made clear that Ms. Gratz was motivated by emotions to fill a void in her heart, and she deeply regrets her actions as outlined in her Acceptance of Responsibility Letter. Sentencing Ms. Gratz to 24 months in prison would adequately ensure she receives appropriate punishment for the offense, but not punishment more than that of similarly situated correctional officers.

**F.     The Need to Provide Restitution to Any Victims of the Offense**

Restitution is not applicable here pursuant to 18 U.S.C. § 3663.

**V.     Conclusion**

For the foregoing reasons, Ms. Gratz respectfully requests that the Court impose a sentence of 24 months imprisonment.

Respectfully submitted,

**SIEBEN EDMUNDS MILLER PLLC**

Dated: <u>November 1, 2024</u>          /s/ Samuel Edmunds
Samuel Edmunds
Attorney No.: 0387359
2640 Eagan Woods Drive, Suite 220
Eagan, MN 55121
(651) 994-6744
sam@siebenedmunds.com

## APPENDIX

Letter of Support from Renee Gratz (Attachment 1)…………….……………………….... 17

Acceptance of Responsibility Letter (Attachment 2)...……………………………………… 18

Letter from Counselor (Attachment 3)……………..…………………………………….…..… 21

Photos of Faith Gratz (Attachment 4).....…………………………………………………… 22

*United States v. Cox*, 449 F. App'x 547 (8th Cir. 2012) (unpublished) (Attachment 5).....……… 23

To whom it may concern,


Hello, my name is Renee Gratz, I'm the mother of Faith Gratz. I would like to take this time to let you know a little bit about my daughter. Faith was a quite child growing up always a follower never a leader.  She has NEVER been or caused any  trouble till now. When Faith started working at Stillwater prison she was so excited to be a corrections officer just like her dad.  It wasn't long after she started working there that she met her husband, Adam. He was also a corrections officer at Stillwater. They got married shortly after they met, and things went downhill from there. Adam was an alcoholic and lost his job at Stillwater. Which left Faith to be the only one working and paying all the bills.  I think that is when all this stuff started happening. I think the inmate probably found out her and Adam were having problems and took advantage of her. Shortly after Faith was released from jail her husband passed away.  Faith has had a hard couple of years but she is on the right track. She has found some jobs that she loves, and she is doing very well. I know you have to do what is right and she needs to pay for what she did. I just wanted to let you know a little bit about Faith. She really is a wonderful, kind and caring person.


Thank You


Renee Gratz mother of Faith Gratz

**Attachment 1**

December 5, 2022


Faith Gratz
657 Ashland Ave., Apt. 2
Saint Paul, MN 55104


Sara De La Riva Brunzell
U.S. Probation Officer
300 South Fourth Street, Suite 406
Minneapolis, MN 55416
Sent via email: sara_delariva_brunzell@mnp.uscourts.gov

RE:        *United States v. Faith Rose Gratz*
           Court File No.: 22-120 (ECT/BRT)
           Acceptance of Responsibility Letter

Dear Ms. De La Riva Brunzell:

I, Faith Gratz, accept full and complete responsibility for the crime of conspiracy to distribute methamphetamine while in possession of a firearm.  I admit to bringing in phones and drugs into a secure prison facility. Over the course of six to seven months, I brought in about six packages with drugs inside the secure facility where I worked as a prison guard.  On April 8, 2022, the day that I was arrested, I was planning to bring in a package containing methamphetamine to the prison. I was in possession of a licensed firearm at the time that I also possessed the drugs I intended to distribute.  I delivered the packages of drugs (and was planning to deliver the package on April 8th) to an inmate by the name of Axel Kramer. While working at the prison, I had developed a relationship with this inmate that was inappropriate because I was in a position of trust and authority over him.

At the time this relationship developed, and I became involved in the actions that turned into this conspiracy to distribute drugs, my home life wasn't very good. It was very stressful and my late husband at the time was drinking a lot. He lost his job and just stayed at home drinking all day. He wasn't looking for a job so for a while I was the only one making money and paying the bills. When I would go to work, Inmate Kramer would start to ask me increasingly personal questions.  The conversations started out with him asking how my night was going and if I was okay.  He told me that he wanted to talk to me more. As our conversations progressed, he asked me if I would bring in a phone so that he could get to know me better. I didn't bring it in right away but then he asked again and begged me for it. After I brought the phone in, he would ask me to go meet a person to pick something up for him.  Initially, I asked him what it was and he told me not to worry about it because he said that he wouldn't put me in harm's way. Early on, I

**Attachment 2**

was sent a large sum of money, I believe it was $5,000, through a cash app on my phone for my participation.  This money helped me out a lot because I was having a hard time financially, but my motivation for bringing packages to Kramer was never about money.

I would say there was a bit of flirtation in our conversations and with what was going on at home it was nice to have some attention. Kramer had brought up that he needed me to go and grab something from someone he called "homies wife." Kramer told me that when I got home that he would message me the details.  I told him that I really didn't know if I should, and that me bringing in the phone was a big deal. He said that this would give us some money for our future and that it was going to be a one-time thing. It turned out that he lied about that because he asked me to do it several more times.

I never knew what exactly I was bringing into the facility because I have never taken or done drugs before. At first the packages I picked up were small but they became a little bigger every time that I picked one up. The first time I could see the stuff it was like a little white substance but I never looked up the stuff.  When I would bring the stuff in and hand it to Kramer I asked him what it was and he had told me not to worry about it because he would take care if it.  He told me again that he wouldn't put me in harm's way. Kramer had told me that the package that I was to bring in was the last time that we would have to deal with this sneaking in stuff.  By the third time he asked me to bring in a package, I suspected it was drugs because the feeling of the package was like a weird hard substance even though I couldn't see it, and the fourth time I could see it and it looked like drugs but I wasn't sure what kind.  The fact is, though, I knew from the beginning that I was helping an inmate bring in some form of contraband and that I was abusing my position of authority and trust by not following the rules of the prison.

When Kramer would ask me to contact these people, I felt that it wasn't right and that I shouldn't do it, but when I would put off contacting the people that he wanted me to he would keep messaging me and saying that they are waiting for my message.  During the process, such as when I finally messaged them, when they told me where to pick up the stuff, and when I got there, I admit that I was really nervous and scared. When I brought in the packages to Mr. Kramer I was, of course, scared to actually bring them inside, and when I did I knew that what I was doing was wrong. I just wish that I would have written an incident report that first time that Kramer had asked me to do this. The proper procedure at the prison would have been to write an incident report and speak to the watch commander and the unit lieutenant – they would have looked into the matter right away.  Kramer might have gotten lockdown for a day or two and the whole rest of the series of events could have been prevented.

The crime I committed has had far-reaching effects on the community and my family. I think that my choice to bring drugs into a secured facility affected the inmates and the officers because I didn't know what I was bringing in and it put their lives at risk because the inmates could have taken it and overdosed on it or could have gone crazy which would then put the officers at risk of getting hurt if the inmates were going crazy or not

cooperating. My choices affected my family because I was on the news and my whole family are basically correction officers as well and so they were asked a billion times by coworkers and inmates if they were related to me. It affected my late husband because we wanted to start a family, he had worked on getting sober so that one day we could, but after my arrest he told me that I lost his trust.

I have changed since all of this happened because I now have two jobs and am working every day. I am in therapy and have been talking about the trauma from my past relationship with my husband and some of the events that led up to me being arrested. I am trying to get help and talking things out which has really helped me control my anxiety. I haven't missed a drug test and I have been following all the rules by contacting my probation officer when needed. I haven't been putting myself into the situations that I was in at the time. I have been working on taking initiative and learning from my mistakes and not dwelling on the past and looking towards the future.

Future goals that I want to accomplish include wanting to go back to school for Mortuary Science. I feel that I can still do what I was called to do which is to help people through hard times when they lose someone close to them like a family member or a spouse, because I have lost people close to me so I really want to do this. I also want to keep these two jobs that I have right now. I am working for The Grand Ole Creamery and Caribou Coffee. They are really amazing, and I have really great co-workers, so I would hate to give them up.

I know that this wrong decision is a one-time thing and is behavior I will never repeat. I have lost so much from this decision that I had made because before this I never touched drugs in my life I didn't even know what I was bringing into the facility. I have been following all the rules and communicating with my probation officer and going to and passing all my drug tests. I am a good person who unfortunately made a huge mistake. I have my family that are holding me accountable and who are watching my back so that nothing like this will ever happen again. Thank you, your Honor, for taking time out of your busy schedule to read this letter.

Respectfully,

*Faith Rose Gratz*

Faith Rose Gratz

CC: Harry Jacobs, Assistant United States Attorney

**Attachment 2**



St. Paul-Main Office
Court International
2550 University Ave. W.
Suite 435S
St. Paul, MN 55114-1096
Ph: 651-647-1900
Fax: 651-647-1861

Burnsville
14300 Nicollet Court
Suite 130
Burnsville, MN 55306
Ph: 952-435-8814
Fax: 952-435-7705

Lake Elmo
8530 Eagle Point Blvd
Suite 150
Lake Elmo, MN 55042
Ph: 651-264-0402
Fax: 651-738-8214

St. Louis Park
Sunset Ridge Business Park
5821 Cedar Lake Road S.
St. Louis Park, MN 55416
Ph: 651-647-1900
Fax: 651-342-8023

DATE:  9/5/2024

TO:

FROM:   Jill  E. Carlson, MA, LPCC

RE:  Faith Gratz,  DOB: 12/21/1997

Dear:

I am the treating provider for your client, Ms. Faith Gratz. Ms. Gratz has requested the team at MidWest Center for Personal and Professional Development to communicate with her legal support team an update related to her engagement in outpatient individual counseling. Ms. Gratz has been consistently attending sessions and is a highly engaged client of talk therapy since September of 2022. Ms. Gratz is a thoughtful, timely and conscientious client at MidWest Center. Ms. Gratz is making strong progress on therapy assignments and treatment goals. I will be following Ms. Gratz's care throughout her engagement at MidWest Center as her primary counselor. Please feel free to call or email me if you need further details regarding Mr. Gratz's treatment plan. If there are any changes with this patient's prognosis, I will be in touch with further documentation.

Sincerely,

_____

*Jill  E. Carlson, MA, LPCC*

**Attachment 3**                                    21



# *United States v. Cox*

United States Court of Appeals for the Eighth Circuit

December 12, 2011, Submitted; February 1, 2012, Filed

No. 11-1833

**Reporter**

449 Fed. Appx. 547 *; 2012 U.S. App. LEXIS 2079 **; 2012 WL 300723

United States of America, Appellee, v. Benjamin John Cox, Appellant.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Arkansas.

**Counsel:** For United States of America, Plaintiff - Appellee: Michael S. Gordon, Assistant U.S. Attorney, U.S. ATTORNEY'S OFFICE, Eastern District of Arkansas, Little Rock, AR.

For Benjamin John Cox, Defendant - Appellant: Joseph Blake Hendrix, Little Rock, AR.

Benjamin John Cox, Defendant - Appellant, Pro se, Vilonia, AR.

**Judges:** Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

## Opinion

[*548] PER CURIAM.

Benjamin John Cox pled guilty to one count of accepting a bribe as a public official, in violation of *18 U.S.C. § 201(b)(2)(C)*. The district court[1] sentenced Cox to twelve months and one day of imprisonment. Cox appeals, arguing that his sentence is substantively unreasonable. We affirm.

I.

In March 2007, Cox began working as a correctional officer at the Federal Correctional Complex located in Forrest City, Arkansas. On January 19, 2008, Cox attempted to smuggle five packs of cigarettes to a prison inmate, but the metallic foil packaging triggered the metal detector as Cox passed through to report for work. Cox admitted to security personnel [**2] that he was bringing the cigarettes to an inmate and consented to a search of his backpack and vehicle. The searches uncovered three water bottles filled with vodka, a bag of fried chicken, two pizzas, six cans of smokeless tobacco, three adult magazines, and cash. When he was interviewed by agents from the Federal Bureau of Investigation, Cox further admitted that he had accepted

---

[1] The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

449 Fed. Appx. 547, *548; 2012 U.S. App. LEXIS 2079, **2

money from an inmate's girlfriend in exchange for providing the inmate with various contraband. Cox admitted that he had successfully smuggled contraband into the prison on seven previous occasions.

Cox was not indicted for the conduct until almost two years after it occurred. In the interim, Cox joined the Arkansas National Guard and was deployed to Iraq. Cox had previously served in the United States Army and the Minnesota National Guard. He earned numerous military medals for outstanding service to the United States and for his volunteer work at an Iraqi children's burn clinic. On December 2, 2009, Cox was charged with accepting a bribe as a public official, in violation of 18 U.S.C. § 201(b)(2)(C), and providing contraband to a prisoner, in violation of 18 U.S.C. § 1791(a)(1). Cox pled guilty to bribery [**3] of a public official, and, pursuant to the plea agreement, the remaining charge against him was dismissed. Cox moved for a downward variance based on the nature and circumstances of the offense and his personal history and characteristics.

At sentencing, the district court calculated Cox's sentencing range under the United States Sentencing Guidelines Manual (Guidelines). Under the Guidelines, Cox's sentencing range was twelve to eighteen months imprisonment. The district court recognized Cox's "long period of service . . . in the United States Army," his "exemplary record," and "innumerable commendations for his excellent service," Sentencing Hr'g Tr. 46, and imposed a sentence of one year and one day, stating:

> I am going to impose a sentence of one year and one day, which I believe is lenient and was much lower than I would ordinarily impose for a law enforcement officer, a person in such a [*549] position of trust. But I am overwhelmed by the good part of his record.

Sentencing Hr'g Tr. 46.[2] The district court further stated, "I am terribly sympathetic with your situation and have great admiration for your service to your country, but I believe this is the only sentence warranted under the [**4] circumstances." Sentencing Hr'g Tr. 47. On appeal, Cox contends that his sentence is substantively unreasonable because "the district court failed to give adequate weight to his history and characteristics" and "he has overcome the appellate presumption of reasonableness that attends to a within-the-Guidelines sentence." Appellant's Br. 8.

II.

"We apply an abuse-of-discretion standard to review the substantive reasonableness of a sentence." United States v. Sandoval-Sianuqui, 632 F.3d 438, 444 (8th Cir. 2011) (citing United States v. Hoffman, 626 F.3d 993, 998 (8th Cir. 2010)). We presume sentences within the advisory Guidelines sentencing range are reasonable, id. (citing United States v. Heath, 624 F.3d

---

[2] By sentencing Cox to one year and one day, the district court made Cox eligible for "good conduct time" under 18 U.S.C. § 3624(b), which provides that prisoners serving more than one year may receive credit for up to 54 days per year for "exemplary compliance with institutional disciplinary regulations."

**Attachment 5**

24

*884, 888 (8th Cir. 2010))*, but the "presumption may be overcome if the district court fails to consider a relevant factor that should have received significant weight, gives significant [**5] weight to an improper or irrelevant factor, or considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Cain, 487 F.3d 1108, 1114 (8th Cir. 2007)* (citing *United States v. Haack, 403 F.3d 997, 1004 (8th Cir. 2005))*. Relevant factors are listed at *18 U.S.C. § 3553(a)*. Id. (citing *United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005))*.

Cox contends that the district court's sentence was substantively unreasonable because, "although it considered only the appropriate factors, it committed a clear error of judgment in weighing those factors." Appellant's Br. 10. Specifically, Cox argues that "the district court gave too much weight to Mr. Cox's violation of public trust and not enough weight to his history and characteristics." Id.

We conclude that Cox's contentions are belied by the record. "The district court has wide latitude to weigh the *§ 3553(a)* factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Bridges, 569 F.3d 374, 379 (8th Cir. 2009)* (citing *Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007))*. Although Cox was a new employee and was a low grade officer, [**6] his primary duty was to ensure security of the facility. Sentencing Hr'g Tr. 12. Cox violated this duty. The district court initially viewed Cox's conduct as deserving of a "very serious sentence." Sentencing Hr'g Tr. 44. But the court was "overwhelmed by the good part of [Cox's] record" and, as set forth above, stated that it was sentencing Cox more leniently than it ordinarily would for a person in his position of trust. The district court also expressed that it was important for Cox's sentence to serve as a deterrent to criminal conduct for other persons in Cox's position of trust. Sentencing Hr'g Tr. 45. We agree with the district court that Cox's situation is sympathetic. The fact that the district court did not weigh the factors as Cox would like, however, does not justify reversal. See *Bridges, 569 F.3d at 379*. The district court did not commit a clear error of judgment, [*550] and Cox has not overcome the presumption of reasonableness accorded a Guidelines sentence.

III.

The judgment is affirmed.

---

**End of Document**